# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MICHELLE R. DALEN, | No. 50391-3-II |
| Appellant, | |
| v. | PART PUBLISHED OPINION |
| ST. JOHN MEDICAL CENTER, PEACE HEALTH, MARC KRANZ, CASCADE EMERGENCY ASSOCIATES, RAMONA SHERMAN, N.P., SISTERS OF ST. JOSEPH OF PEACE, | |
| Respondents. | |
| LOWER COLUMBIA MENTAL HEALTH, | |
| Defendant. | |

MAXA, C.J. – Michelle Dalen appeals the trial court's dismissal on summary judgment of

a lawsuit she filed against St. John Medical Center (SJMC), PeaceHealth, Dr. Marc Kranz,

Cascade Emergency Associates, Ramona Sherman, and Sisters of St. Joseph of Peace

(collectively, respondents[1]).  Dalen asserted various claims relating to her treatment and

involuntary detention in the SJMC emergency department (ED) and her involuntary admission to

---

[1] Dalen does not specify whether she claims that only some or all of the respondents are liable on her various claims.  Therefore, we will generically refer to all respondents regarding all claims unless otherwise specified.

the SJMC psychiatric unit after she arrived at the ED complaining of a head injury following a fall.

In the published portion of this opinion, we hold that the trial court erred in granting summary judgment in favor of the respondents on (1) Dalen's claim for violation of chapter 71.05 RCW regarding her initial detention and her continued detention in the ED pending an evaluation by a designated crisis responder, and (2) Dalen's claim for failure to obtain her consent for medical treatment forced on her. However, we hold that the trial court did not err in granting summary judgment in favor of the respondents on Dalen's claim for violation of chapter 71.05 RCW based on her involuntary admission to the SJMC psychiatric unit.

In the unpublished portion of this opinion, we affirm the trial court's grant of summary judgment on Dalen's remaining claims against all respondents and the grant of summary judgment in favor of Dr. Kranz based on insufficient service of process, but we reverse the trial court's grant of summary judgment in favor of Cascade based on insufficient service of process.

Accordingly, we reverse the trial court's summary judgment dismissal of Dalen's claims for violation of chapter 71.05 RCW regarding her involuntary detention in the ED, lack of consent claims, and claims against Cascade, but we affirm the trial court's dismissal of Dalen's remaining claims and all claims against Dr. Kranz.

FACTS

*Detention in SJMC Emergency Department*

On February 25, 2011, Dalen slipped on ice in front of her home and fell, hitting her head on the pavement. In the following days she began to experience "odd emotional reactions, unusual fatigue, delayed responses and confusion." Clerk's Papers (CP) at 46. Her father noted that she was "talking funny." CP at 46. Dalen and her family decided to go to the hospital.

On February 28, Dalen arrived at the SJMC ED, accompanied by her father, step-mother, and sister. PeaceHealth operated SJMC. Cascade provided medical services in the SJMC ED. Dr. Kranz was an emergency department doctor and an employee of Cascade. Sherman was employed by PeaceHealth as a psychiatric nurse practitioner.

Dalen and her sister, Kristin Wallace, explained to the ED receptionist that Dalen had fallen and hit her head. Dalen and Wallace were taken to see a triage nurse at 1:39 PM. The triage nurse listed Dalen's chief complaint as "delusions." CP at 67. The nurse stated that Dalen was alert but disoriented, and obeyed commands. For history, the nurse recorded that Dalen had been confused and admitted to having hallucinations since the onset two days before. Although the record is unclear, the parties appear to agree that the triage nurse recommended admission for psychiatric treatment and Dalen declined admission.

At this point, two security guards forcibly grabbed Dalen and took her to a back room while she screamed for her father. The hospital records state that security carried Dalen to a room and that she was "screaming while going down [the] hall." CP at 64. The guards took Dalen by force to a room, where she was forcibly disrobed and placed in a hospital gown. She then was restrained while hospital staff drew blood without attempting to obtain her consent. Dalen was secluded in her room with security present.

The physical assessment in the medical records stated that Dalen was anxious and confused, although her speech was within normal limits. A nursed stated that Dalen's "[b]ehavior appears abnormal, including paranoid behaviors and having apparent auditory hallucinations." CP at 64. She yelled, "[S]top screaming in my head." CP at 64. Dalen apparently was seen by Dr. Kranz. However, the record does not reflect whether Dr. Kranz

evaluated Dalen at that time or determined that she should continue to be detained. Wallace asserted that she told a doctor that Dalen had fallen and hit her head.

Lisa Lovingfoss, a social worker, evaluated Dalen at approximately 2:46 PM. Lovingfoss noted that Dalen's speech was confused and reported that Dalen was unable to maintain attention to answer questions. Lovingfoss also spoke with Wallace, noting that Wallace stated that Dalen's family had been concerned about her since the previous day as she exhibited "very odd behavior and continuously spoke, but did not make any sense." CP at 65. However, the record does not reflect whether Lovingfoss determined that Dalen should continue to be detained. Wallace asserted that she told a social worker that Dalen had fallen and hit her head.

Dalen refused to give a urine sample voluntarily. As a result, she was forcibly catheterized while four men restrained her. The hospital note stated that security and three other staff assisted in holding Dalen. Dalen's legs were spread and her gown was pulled up, exposing most of her unclothed body to the men holding her. She remained confined to the treatment room, supervised by SJMC staff and security. Dalen's toxicology screen came back negative for drugs.

The hospital notes state that Dalen was pacing the floor and staring into the hall with a "wild, paranoid gaze." CP at 65. A nurse recorded that Dalen stated, "I know you from a dream, you are a doctor's wife. You have a big belly. You look like a Disney ride." CP at 65. Dalen then pressed her face into the window and kissed the glass. Dr. Kranz later reported that it was possible that Dalen was manic and psychotic or maybe just psychotic, and noted her "bizarre and erratic behavior." CP at 67.

At some point, Dalen was forcibly administered Geodon, a drug commonly used for schizophrenia and bipolar disorder.

*Involuntary Admission to Psychiatric Unit*

At some unknown time, the ED medical staff requested that Dalen be evaluated for grave disability and possible hospitalization. At approximately 3:50 PM, Bobbi Woodford, a county designated mental health professional from Lower Columbia Mental Health, evaluated Dalen.

Woodford stated that Dalen "presented as confused, guarded, and disoriented, with impaired memory, insight, and judgment." CP at 281. Dalen's "hallucinations were both visual and auditory" and she "was unable to separate/differentiate between her dreams and reality." CP at 282. Woodford concluded that "[a]t this time, it is evident that [Dalen] suffers from a mental disorder, which renders her gravely disabled." CP at 282. She stated that "no less restrictive alternatives to involuntary treatment . . . will protect [Dalen's] best interests." CP at 286.

Later that day, Woodford prepared a petition for initial detention of Dalen under chapter 71.05 RCW. She certified, "As a result of my personal observation or investigation, I believe the actions of [Dalen] constitute a likelihood of serious harm to [Dalen], others, or to the property of others, or that the respondent is gravely disabled." CP at 280. Woodford requested that Dalen be detained at an evaluation and treatment facility for no more than 72 hours. Woodford directed that Dalen be taken into custody and placed at SJMC.

Dalen was involuntarily admitted to the SJMC psychiatric unit. She remained involuntarily hospitalized from February 28 until March 2. Her request on March 1 to be released was denied.

Two years later, a doctor rendered an opinion that Dalen had suffered a "mild traumatic brain injury with residual post concussion syndrome." CP at 108. A subsequent neuropsychological examination revealed lingering effects of a traumatic brain injury.

*Dalen's Complaint and Summary Judgment*

On February 26, 2014, Dalen, representing herself, filed a lawsuit against the respondents as well as Lower Columbia Mental Health.[2] The complaint included 10 causes of action, including violation of chapter 71.05 RCW and failure to obtain informed consent.

The respondents filed a summary judgment motion regarding each of Dalen's claims. In support of the motion, the respondents submitted a declaration attaching certain materials that apparently were filed under seal. But those materials are not in the appellate record. The respondents did not file declarations from Dr. Kranz or any other medical providers regarding Dalen's detention.

In response, Dalen submitted three declarations from herself, portions of her medical records, a copy of a newspaper article written about her involuntary commitment and Dr. Kranz's related comments, and several other declarations. These submittals included declarations from two experts, Lisa Taylor, a registered nurse, and Janet Hart Mott, Ph.D.

The trial court granted the motion and dismissed all of Dalen's claims against the respondents. Dalen appeals the trial court's summary judgment order.

ANALYSIS

A.    SUMMARY JUDGMENT STANDARD

We review dismissal on summary judgment de novo. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017). We review all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d

---

[2] In August 2016, Lower Columbia Mental Health filed a motion to dismiss all claims against it. The trial court apparently granted this motion. Lower Columbia Mental Health is not a party to this appeal.

1080 (2015). We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 182, 401 P.3d 468 (2017). There is a genuine issue of material fact when reasonable minds could differ on the controlling facts controlling the outcome of the litigation. *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 864-65, 324 P.3d 763 (2014).

The party moving for summary judgment has the initial burden to show there is no genuine issue of material fact. *Zonnebloem*, 200 Wn. App. at 183. A moving defendant can meet this burden by showing that there is an absence of evidence to support the plaintiff's claim. *Id.* Once the defendant has made such a showing, the burden shifts to the plaintiff to present specific facts that show a genuine issue of material fact. *Id.* Summary judgment is appropriate if a plaintiff fails to show sufficient evidence to establish the existence of an element on which he or she will have the burden of proof at trial. *Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 176 Wn. App. 168, 179, 313 P.3d 408 (2013).

B. VIOLATION OF INVOLUNTARY COMMITMENT STATUTE

Dalen argues that the trial court erred in granting summary judgment on her claims for violation of chapter 71.05 RCW, which were based on her initial detention at triage, her continued detention in the ED until she could be evaluated by a crisis responder, and her involuntary admission to the SJMC psychiatric unit. We hold that genuine issues of fact exist regarding whether the respondents' initial detention of Dalen and their continued detention until she could be evaluated by a crisis responder violated RCW 71.05.050 and whether the respondents are entitled to immunity. But we affirm the trial court's granting summary judgment on Dalen's claim based on her involuntary admission to the SJMC psychiatric unit.

1. Legal Principles

a. Detention of Persons with Mental Disorders

As relevant here, chapter 71.05 RCW[3] governs the involuntary detention of persons with mental disorders. Under certain circumstances, a hospital emergency department can temporarily detain a person for further evaluation. RCW 71.05.050. Following the evaluation, the person may be involuntarily admitted to an evaluation and treatment facility for up to 72 hours. RCW 71.05.153.

Under RCW 71.05.050(3), a person brought to a hospital emergency department for "observation and treatment" can be involuntarily detained if he or she refuses voluntary admission and "the professional staff of the . . . hospital regard such person [1] as presenting as a result of a mental disorder . . . an imminent likelihood of serious harm, or [2] as presenting an imminent danger because of grave disability." The purpose of this detention is to notify the designated crisis responder[4] of such person's condition to enable the designated crisis responder to authorize further detention. RCW 71.05.050(3). This initial detention can be for no more than six hours. RCW 71.05.050(3).

In *In re Detention of C.W.*, the Supreme Court explained that under former RCW 71.05.050 (1998), three events must occur before the hospital staff may refer a person to the designated crisis responder:

> First, a person must be brought to the hospital or agency for "observation or treatment." Second, the person must refuse voluntary admission. Third, the

---

[3] Several sections of chapter 71.05 RCW have been amended since Dalen's detention: RCW 71.05.020, RCW 71.05.050, RCW 71.05.120, and RCW 71.05.153. The amendments to RCW 71.05.050 include dividing the provision into subsections. Because these amendments are not relevant here, we refer to the current versions of the statute unless otherwise indicated.

[4] At the time of Dalen's detention, the designated crisis responder was referred to as the county designated mental health professional (CDMHP). Former RCW 71.05.050 (2000).

professional staff must "regard" the person as "presenting as a result of a mental disorder an imminent likelihood of serious harm, or as presenting an imminent danger because of grave disability."

147 Wn.2d 259, 272, 53 P.3d 979 (2002) (quoting former RCW 71.05.050). Once these conditions are met, hospital staff may detain a person for no more than six hours to allow the crisis responder's evaluation. *Id.*

"Imminent" is defined as "the state or condition of being likely to occur at any moment or near at hand, rather than distant or remote." RCW 71.05.020(26).[5] "Likelihood of serious harm" means:

> (a) A substantial risk that: (i) Physical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself; (ii) physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (iii) physical harm will be inflicted by a person upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others; or
> (b) The person has threatened the physical safety of another and has a history of one or more violent acts.

RCW 71.05.020(35).[6]

"Gravely disabled" is defined as

> a condition in which a person, as a result of a mental disorder, or as a result of the use of alcohol or other psychoactive chemicals: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

---

[5] The former version of this provision in effect when Dalen was detained was found in RCW 71.05.020(20) (2009).

[6] The former version of this provision in effect when Dalen was detained was found in RCW 71.05.020(25).

RCW 71.05.020(22).[7]  *See generally In re LaBelle*, 107 Wn.2d 196, 205-08, 728 P.2d 138 (1986).

Under RCW 71.05.153(1), when the designated crisis responder receives an allegation that a person "as the result of a mental disorder, presents an imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled" and confirms the allegation after investigation and evaluation, the crisis responder can order such person to be taken into emergency custody in an evaluation and treatment facility for not more than 72 hours.

        b.    Health Care Provider Immunity

RCW 71.05.120(1) provides criminal and civil immunity to providers of mental health care "for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence."

Bad faith requires a conscious doing of wrong, through "tainted or fraudulent motives." *Spencer v. King County*, 39 Wn. App. 201, 208, 692 P.2d 874 (1984), *overruled on other grounds by Frost v. City of Walla Walla*, 106 Wn.2d 669, 724 P.2d 1017 (1986).  Gross negligence is "substantially and appreciably greater than ordinary negligence." *Estate of Davis v. Dep't of Corr.*, 127 Wn. App. 833, 840, 113 P.3d 487 (2005).  To avoid summary judgment on gross negligence, a plaintiff must present "substantial evidence that the defendant failed to exercise slight care under the circumstances presented, considering both the relevant failure and, if applicable, any relevant actions that the defendant did take." *Harper v. Dep't of Corr.*, 192

---

[7] The former version of this provision in effect when Dalen was detained was found in RCW 71.05.020(17).

Wn.2d 328, 343, 429 P.3d 1071 (2018). An incomplete or even unreasonable assessment under chapter 71.05 RCW does not necessarily rise to the level of gross negligence under RCW 71.05.120. *See Davis*, 127 Wn. App. at 841.

2.    Detention at Triage

Dalen argues that genuine issues of fact exist whether the respondents violated RCW 71.05.050(3) by involuntarily detaining her at triage and whether that detention was done with bad faith or gross negligence to negate statutory immunity. We agree based on the limited record presented at summary judgment.

a.    Violation of RCW 71.05.050(3)

Dalen argues that there is a question of fact as to whether SJMC violated RCW 71.05.050(3) by involuntarily detaining her at triage before professional staff determined that she presented an imminent likelihood of serious harm or an imminent danger because of grave disability. Under certain circumstances, RCW 71.05.050(3) allows initial detention of a person with a mental disorder until hospital staff can evaluate that person. However, we hold on the record here that a genuine issue of fact exists as to whether the triage nurse had justification for initially detaining Dalen.

As noted above, RCW 71.05.050 allows a hospital emergency department to detain a person for up to six hours if the person refuses voluntary admission and after hospital staff determines that a person presents because of a mental disorder an imminent likelihood of serious harm or an imminent danger because of grave disability. However, the statute is silent as to whether a hospital can initially detain a person to allow hospital staff to make such a determination.

11

In *C.W.*, the Supreme Court addressed whether the six hour detention limit in RCW 71.05.050 started when the person was first detained or when hospital staff determined that referral to the designated crisis responder was appropriate. 147 Wn.2d at 271-76. The court concluded that under the plain statutory language, the time limit started when hospital staff determined that a designated crisis responder evaluation was necessary. *Id.* at 272-73.

The court essentially assumed that a hospital emergency department could detain a person with a mental disorder until hospital staff had time to make that determination. *Id.* at 273-76. The court stated,

> The plain language of the statute anticipates that the professional staff will need a period of time to examine a person in order to determine whether the person suffers from a mental disorder that is likely to cause "imminent likelihood of serious harm" or "imminent danger because of grave disability," whether he or she will refuse voluntary admission, and whether further custody is necessary.

*Id.* at 273 (quoting RCW 71.05.050). And the court noted, without questioning the procedure, that persons who present with psychiatric symptoms often are restrained before being fully evaluated. *Id.* at 273; *see also* 273 n.11.

The court rejected the argument that what it termed "predetention restraint" was inconsistent with chapter 71.05 RCW. *Id.* at 274-76. The court stated, "RCW 71.05.050 does allow for such a period of restraint, if necessary, to evaluate the person to determine whether he or she meets the statutory requirements for notifying the CDMHP [county designated mental health professional]." *Id.* at 276.[8]

---

[8] In her reply brief, Dalen criticizes the holding in *C.W.* and quotes extensively from the dissent in that case. She apparently claims that *C.W.* was wrongly decided and, as the dissent in that case argues, that there is no legal basis for an initial detention. However, we disagree. And we are bound to follow Supreme Court precedent. *Gorman v. Pierce County*, 176 Wn. App. 63, 76, 307 P.3d 795 (2013).

A contrary interpretation of RCW 71.05.050 would be illogical because one of the requirements of that statute is that the person with a mental disorder must refuse voluntary admission. If a hospital emergency department could not initially detain a person who refused admission, hospital staff would never have the ability to evaluate the person to determine if referral to a designated crisis responder was necessary and RCW 71.05.050 would be meaningless.

Neither RCW 71.05.050 nor the court in *C.W.* discuss the circumstances in which a hospital can initially detain a person pending a hospital staff evaluation. We hold that RCW 71.05.050 authorized SJMC to initially detain Dalen until hospital staff had the opportunity to evaluate her only if it had some legitimate basis *grounded in the requirements of RCW 71.05.050* to involuntarily detain her at triage. The person authorizing the initial detention must at least have a reasonable suspicion that hospital staff would determine after an evaluation that the patient presented an imminent likelihood of serious harm or an imminent danger because of grave disability as required for detention under RCW 71.05.050(3).

Here, Dalen told the receptionist that she had fallen and hit her head. The triage notes state that Dalen's chief complaint was delusions and that her verbal response was confused, but that she was alert and that she obeyed commands. The only history in the record was, "The patient has been confused. Admits to having hallucinations." CP at 64. Significantly, the hospital records do not state any facts that would lead to a conclusion that Dalen presented an imminent likelihood of serious harm or an imminent danger because of grave disability. And the record does not contain a declaration or testimony from the triage nurse to explain why she believed that involuntary detention was necessary.

13

Nothing in the sparse summary judgment record shows any basis for the triage nurse to suspect that Dalen presented an imminent likelihood of serious harm or an imminent danger because of grave disability when she arrived at triage. The respondents suggest that we can infer from Dalen's behavior *after* she was involuntarily detained that the triage nurse was justified in detaining her. But when reviewing a summary judgment order, we are required to accept inferences that favor the nonmoving party, not inferences that favor the moving party.

We hold that a genuine issue of material fact exists as to whether the respondents violated RCW 71.05.050(3) by initially detaining Dalen.

        b.    Statutory Immunity

The respondents argue that even if they violated RCW 71.05.050 by initially detaining Dalen, they are entitled to immunity under RCW 71.05.120(1). A provider of mental health care is immune from civil liability with regard to the decision of whether to detain a person for evaluation and treatment if the provider's duties were "performed in good faith and without gross negligence." RCW 71.05.120(1).

There is no evidence of bad faith here. But regarding gross negligence, the triage nurse involuntarily detained Dalen based on a report of a fall-related head injury and nothing in the summary judgment record showed any basis for her to suspect that Dalen presented an imminent likelihood of serious harm or an imminent danger because of grave disability. Again, the record contains no testimony from the triage nurse or any other evidence to explain why Dalen was detained. Under the sparse facts here, we hold that there is a genuine issue of fact whether the respondents were grossly negligent in initially detaining Dalen.

14

3.    Detention before Designated Crisis Responder Evaluation

Dalen argues that genuine issues of fact exist whether her *continued* detention until the Woodford evaluation violated RCW 71.05.050(3) and whether that detention was done with bad faith or gross negligence to negate statutory immunity. We agree based on the limited summary judgment record.

a.    Violation of RCW 71.05.050(3)

Dalen claims that there is a question of fact as to whether the respondents violated RCW 71.05.050(3) because she did not present an imminent likelihood of serious harm or an imminent danger because of grave disability as required for continued detention pending the Woodford evaluation.

The respondents point to Dalen's abnormal behavior as documented in the medical records. Dalen admitted to having hallucinations. She showed paranoid behaviors and auditory hallucinations, and yelled, "[S]top screaming in my head." CP at 64. Her speech was incomprehensible. The social worker and nurses observed very odd comments and behavior. Dr. Kranz reported bizarre and erratic behavior. And the respondents emphasize that Woodford found that Dalen was gravely disabled.

However, nothing in the sparse summary judgment record shows that hospital staff ever made the threshold determination required by RCW 71.05.050(3) to detain Dalen pending evaluation by the designated crisis responder. Specifically, the record does not show that Dr. Kranz or any other hospital staff member ever made the determination that Dalen presented an imminent likelihood of serious harm or an imminent danger because of grave disability as required for detention under RCW 71.05.050. Nothing in the record explains the decision to detain Dalen. Significantly, the record does not contain any declaration or testimony from Dr.

15

Kranz or anyone else stating that they had made the required determination that Dalen presented an imminent likelihood of serious harm or an imminent danger because of grave disability.

Based on the absence of evidence, we must infer for summary judgment purposes that the respondents never determined that Dalen presented an imminent likelihood of serious harm or an imminent danger because of grave disability as required to detain her under RCW 71.05.050(3). As a result, we hold that genuine issues of material fact exist as to whether the respondents violated RCW 71.05.050(3) by continuing to detain Dalen pending the Woodford evaluation.

b. Statutory Immunity

The respondents argue that even if they violated RCW 71.05.050(3) by continuing to detain Dalen pending the Woodford evaluation, they are entitled to immunity under RCW 71.05.120(1). As noted above, a provider of mental health care is immune from civil liability with regard to the decision of whether to detain a person for evaluation and treatment if the provider's duties were "performed in good faith and without gross negligence." RCW 71.05.120(1).

There is no evidence of bad faith here. But regarding gross negligence, the respondents continued to involuntarily detain Dalen even though there is no showing in the record that the respondents ever evaluated Dalen to determine whether she presented an imminent likelihood of serious harm or an imminent danger because of grave disability as required under RCW 71.05.050. Again, the record contains no testimony from Dr. Kranz or any other evidence to explain why Dalen was detained. Under the sparse evidence presented here, we hold that there is a genuine issue of fact whether the respondents were grossly negligent in continuing to detain Dalen pending the Woodford evaluation.

16

4.  72-Hour Detention

Dalen appears to challenge her 72-hour detention ordered by Woodford on the same grounds that she challenges her detention in the ED. In addition, she argues that she was not allowed to have an attorney or family member present at Woodford's evaluation in violation of former RCW 71.05.150 (2007).

However, Woodford was employed by Lower Columbia Mental Health, which was dismissed on summary judgment and is not a party to this appeal. Dalen has presented no evidence that SJMC or any other respondent was responsible for Woodford's decision to involuntarily admit her to the SJMC psychiatric unit. Therefore, we reject Dalen's claims to the extent that they relate to her 72-hour detention.

5.  Summary

The limited summary judgment record reflects genuine issues of material fact as to whether the respondents violated RCW 71.05.050(3) by initially detaining Dalen at triage and then continuing to detain her in the ED pending Woodford's evaluation. And the summary judgment record reflects a genuine issue of material fact as to whether the respondents acted with gross negligence to negate immunity under RCW 71.05.120(1). Therefore, we hold that the trial court erred in granting summary judgment in favor of the respondents on Dalen's claims for violation of RCW 71.05.050(3) based on the initial detention and the continued detention, but not based on the 72-hour detention.

C.  LACK OF INFORMED CONSENT

Dalen argues that the trial court erred in dismissing her lack of consent claim because she did not consent to treatment forced upon her and because the respondents failed to establish

implied consent in an emergency situation under RCW 7.70.050(4) or that they were entitled to immunity under RCW 18.71.220 for providing emergency medical services. We agree.

1. Legal Principles

The medical malpractice statute authorizes a cause of action for injury resulting "from health care to which the patient or his or her representative did not consent." RCW 7.70.030(3). RCW 7.70.050(1) states the elements of a claim for lack of *informed* consent. But Dalen alleges that she did not consent at all to the treatment forced upon her during her detention in the ED.

RCW 7.70.050(4) provides that consent can be implied in certain emergency situations. "If a recognized health care emergency exists and the patient is not legally competent to give an informed consent and/or a person legally authorized to consent on behalf of the patient is not readily available, his or her consent to required treatment will be implied." RCW 7.70.050(4).

For purposes of giving consent for health care pursuant to RCW 7.70.050, an "incompetent" person is "(i) incompetent by reason of mental illness, developmental disability, senility, habitual drunkenness, excessive use of drugs, or other mental incapacity, of either managing his or her property or caring for himself or herself, or both, or (ii) incapacitated as defined in (a), (b), or (d) of this subsection." RCW 11.88.010(1)(e). If a patient is not competent, persons authorized to consent on behalf of the patient include the patient's parents and adult siblings. RCW 7.70.065(1)(a)(v)-(vi).

RCW 18.71.220 provides immunity to health care providers for failure to obtain consent when providing emergency medical services.

> No physician or hospital licensed in this state shall be subject to civil liability, based solely upon failure to obtain consent in rendering emergency medical, surgical, hospital, or health services to any individual . . . where [the] patient is unable to give his or her consent for any reason and there is no other person reasonably available who is legally authorized to consent to the providing of such care:

> PROVIDED, That such physician or hospital has acted in good faith and without knowledge of facts negating consent.

RCW 18.71.220.

2. Failure to Obtain Consent

Dalen does not expressly identify all the treatment for which she alleges the respondents failed to obtain consent. However, three actions in the ED clearly fall into this category: the blood draw, the catheterization, and the administering of medication.

Regarding the blood draw, Dalen stated that she was "forcibly restrained while staff drew blood with no attempt to gain consent." CP at 48. Regarding the catheterization, Dalen described being "forcibly catheterized" while being held down after begging to be allowed to urinate on her own. CP at 48-49. This testimony at least creates genuine issues of fact whether the respondents obtained consent for these procedures.

Regarding the administering of medication, Dalen stated that she was "forcibly drugged intravenously." CP at 49. Dalen did not expressly state that she did not consent to receiving this medication. But viewed in the light most favorable to her, the fact that the medication was given "forcibly" is sufficient to create a genuine issue of material fact regarding her consent.

3. Implied Consent Under RCW 7.70.050(4)

Under RCW 7.70.050(4), consent can be implied if (1) "a recognized health care emergency exists," (2) "the patient is not legally competent to give informed consent," and/or (3) "a person legally authorized to consent on behalf of the patient is not readily available." Under RCW 7.70.050(4), "consent is implied by law in view of the existence of a recognized health care emergency and the impracticality of obtaining informed consent in such circumstances." *Stewart-Graves v. Vaughn*, 162 Wn.2d 115, 126, 170 P.3d 1151 (2007).

First, Dalen argues that it is not clear that any medical emergency actually existed in her case. "The existence of a medical emergency is ordinarily a factual question for the jury." *Stewart-Graves,* 162 Wn.2d at 124. Here, Dalen arrived at the ED approximately two days after her injury and had been experiencing symptoms of varying degrees of severity throughout that time. Although her mood, emotions, behavior, and cognitive function all were affected by her injury, there was no evidence to suggest that she presented a medical *emergency*. A genuine issue of fact exists regarding this issue.

Second, Dalen argues that respondents did not establish that she was not competent to consent to treatment herself. Here, Dalen may not have been competent to consent to treatment due to her confusion, disorientation, inability to maintain attention, paranoia, and hallucinations. However, there also is evidence that Dalen was alert and responsive to questions, at least early in her ED visit. A genuine issue of fact exists regarding this issue.

Third, Dalen argues that, even if there was an emergency during which she was not competent to give consent, the respondents still were obligated under RCW 7.70.050(4) to obtain consent from a person legally authorized to consent on her behalf if such a person was available. Parents and adult siblings of the patient are so authorized. RCW 7.70.065(1)(a). Both Dalen's sister and her father were present with her in the ED, but neither were asked to consent to the care Dalen received. A genuine issue of fact exists regarding this issue.

We hold that RCW 7.70.050(4) does not support summary judgment in favor of the respondents on Dalen's lack of consent claim because genuine issues of material fact exist regarding all three statutory requirements.

4.    Immunity Under RCW 18.71.220

Under RCW 18.71.220, there is no civil liability solely for failure to obtain consent if (1) the physician or hospital renders "emergency medical, surgical, hospital, or health services," (2) "[the] patient is unable to give his or her consent for any reason," and (3) "there is no other person reasonably available who is legally authorized to consent to the providing of such care." These three requirements are similar to the RCW 7.70.050(4) requirements. In addition, the physician or hospital must have "acted in good faith and without knowledge of facts negating consent." RCW 18.71.220.

The analysis under RCW 7.70.050(4) applies equally to RCW 18.71.220. As discussed above, there are genuine issues of fact whether an emergency existed, whether Dalen was able to give consent, and whether Dalen's father and adult sister, who were legally authorized to give consent, were reasonably available. In addition, there is a genuine issue of fact whether the respondents acted without knowledge of facts negating consent. Therefore, we hold that the application of RCW 18.71.220 does not support summary judgment in favor of the respondents on Dalen's lack of consent claim.

5.    Consent Requirement after Involuntary Detention

The respondents suggest that consent was not required for necessary treatment once a person is involuntarily detained under former RCW 71.05.050(3). However, we hold above that genuine issues of fact exist as to whether Dalen was *lawfully* detained under RCW 71.05.050(3). Therefore, we do not address this issue.

6.    Summary

Questions of fact exist whether the respondents failed to obtain consent from Dalen before providing certain treatment, whether consent can be implied under RCW 7.70.050(4), and

whether the respondents are entitled to immunity under RCW 18.71.220. Accordingly, we hold that the trial court erred in granting summary judgment in favor of the respondents on Dalen's lack of consent claim.

CONCLUSION

We reverse the trial court's summary judgment dismissal of Dalen's claims for violation of RCW 71.05.050(3) regarding her involuntary detention in the ED, her lack of consent claims, and her claims against Cascade, but we affirm the trial court's dismissal of Dalen's remaining claims and all claims against Dr. Kranz.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

In the unpublished portion of this opinion, we hold that (1) the trial court did not err in granting summary judgment on Dalen's medical malpractice claim for negligent diagnosis and treatment of her head injury because Dalen's expert witnesses were not qualified to testify about the applicable standard of care or the breach of that standard of care; (2) the trial court did not err in granting summary judgment on Dalen's emotional distress claims because she did not plead or argue that those claims related to conduct that occurred after the involuntary commitment; and (3) the trial court did not err in granting summary judgment in favor of Dr. Kranz on all claims because the service of process on him was insufficient, but the court did err in granting summary judgment in favor of Cascade because a genuine issue of fact existed as to whether the person served had authority to accept service on behalf of Cascade.

ADDITIONAL FACTS

In December 2012, a local newspaper published a lengthy article about Dalen's involuntary admission to SJMC. A person with a user name associated with Dr. Kranz posted an online comment about the article, which stated in part, "I have over 20 years of experience with taking care of people with head injuries and have never seen a head injury cause delusions or hallucinations. I have seen mental illness and street drugs cause these symptoms. She was taken care of and kept safe and should be thankful." CP at 92.

In her complaint, Dalen among other claims alleged medical malpractice, negligent infliction of emotional distress, intentional infliction of emotional distress, and outrage.

On May 19, 2014, Dalen had the summons and complaint served on an assistant at the risk management department of PeaceHealth. Dalen's process server attested in her affidavit of service that Kelly Dombrowsky, a PeaceHealth risk management assistant, affirmed that she was "the acting agent able to accept service" for all of the respondents. CP at 291. Dalen never personally served Dr. Kranz or Cascade. Both first received notice of the lawsuit in January 2016.

The respondents submitted a declaration from Daniel Huhta, a PeaceHealth risk management employee, stating that PeaceHealth was at no time authorized to accept service for Dr. Kranz or Cascade.

The trial court dismissed all these claims on summary judgment.

ANALYSIS

A.    MEDICAL MALPRACTICE CLAIM

Dalen argues that the trial court erred in dismissing her medical malpractice claim based on RCW 7.70.030(1) because the expert testimony she presented created a genuine issue of fact

23

regarding whether the respondents breached the standard of care in diagnosing and treating her head injury. We disagree.

1. Legal Background

Chapter 7.70 RCW modified "certain substantive and procedural aspects of all civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for injury occurring as a result of health care." RCW 7.70.010. The definition of "health care provider" in RCW 7.70.020 includes physicians, nurses, psychologists, and nurse practitioners. Chapter 7.70 RCW exclusively governs any action for damages based on an injury resulting from health care. *Fast v. Kennewick Pub. Hosp. Dist.*, 187 Wn.2d 27, 34, 384 P.3d 232 (2016).

One of the grounds for recovering damages for "injury occurring as the result of health care" is "[t]hat injury resulted from the failure of a health care provider to follow the accepted standard of care." RCW 7.70.030(1).

For a damages claim based on a health care provider's failure to follow the accepted standard of care under RCW 7.70.030(1), a plaintiff must prove both that the health care provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider" and that such failure was a proximate cause of the plaintiff's injuries. RCW 7.70.040. The applicable standard of care generally must be established by expert testimony. *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 86, 419 P.3d 819 (2018). The expert testimony must establish what a reasonable medical provider would or would not have done under the circumstances, that the defendant failed to act in that manner, and that this failure caused the plaintiff's injuries. *Keck*, 184 Wn.2d at 371. If the plaintiff lacks expert testimony regarding one of the required elements, the defendant is entitled to summary judgment on liability. *Reyes*, 191 Wn.2d at 86.

2.    Analysis

The question here is whether Dalen presented *qualified* expert testimony on the standard of care and breach that created genuine issues of fact.

The admissibility of an expert's testimony is not based on his or her professional title, but instead on the scope of the expert's knowledge.  *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 447, 177 P.3d 1152 (2008).  "A witness may testify as an expert if he or she possess knowledge, skill, experience, training, or education that will assist the trier of fact."  *Id.* (citing ER 702).  ER 702 provides the trial court a mechanism to determine whether an expert opinion is sufficient based on the qualifications of the expert and the statutory scope of that expert's authority and certification as a health care provider.  *See Frausto*, 188 Wn.2d at 241.

Here, Taylor stated "I am a registered nurse, receiving a BSN in 1992.  From 1993 to 2005 I worked with in-patient mental health care at the Portland Veterans Administration Hospital."  CP at 57.  Mott testified that "I am the Clinical Case Manager for the Brain Injury Alliance of Washington.  I have a Ph.D. in Rehabilitation. . . . My professional experience and education have provided me with the opportunity to work with many individuals who sustained brain injuries during my 52 year career as a rehabilitation counselor and case manager."  CP at 121-22.

Despite Taylor's experience in mental health in-patient care and Mott's experience in brain injury rehabilitation, neither of them claimed to have any experience providing care in an emergency department setting.  Neither stated any reason why she was qualified to opine on the standard of care for emergency department health care providers treating a patient presenting with Dalen's symptoms.  Neither claimed to have any knowledge about emergency department

triage, admission, or diagnostic procedures, or knowledge about how emergency department staff determine whether a patient should be evaluated for possible involuntary commitment.

Accordingly, we hold that the trial court did not err in dismissing Dalen's medical negligence claim because she did not present qualified expert testimony regarding the standard of care or the breach of the standard of care.[9]

## B.   EMOTIONAL DISTRESS CLAIMS

Dalen concedes that any intentional infliction of emotional distress, negligent infliction of emotional distress, and outrage claims relating to her involuntary detention are subsumed in her medical malpractice claim.  But she argues the trial court erred in dismissing those claims because they actually relate to the respondents' conduct *after* her involuntary commitment.  We decline to consider this argument because Dalen did not assert this claim in the trial court or present evidence to support the claim.

Under RAP 2.5(a), we may refuse to review any claim of error which was not raised in the trial court.  Dalen argues on appeal that her emotional distress claims actually arose from respondents' attempt to recover a $3,000 medical bill and Dr. Kranz's comments in an online newspaper forum responding to the newspaper article about Dalen's involuntary admission.[10] She claims that her complaint described the newspaper article published on her experience at SJMC, which disclosed her private information without her consent, as well as Dr. Kranz's alleged inflammatory response.

---

[9] Even if the experts were qualified, their testimony also failed to establish the relevant standard of care, breach, and causation.  Therefore, summary judgment on the medical malpractice claims also was appropriate on that basis.

[10] In her brief, Dalen also references "hateful things" that were said to her, apparently after her hospitalization.  However, she does not provide any citation to the record for this statement and there is no evidence in the record to support this claim.

Under CR 8(a), a complaint must contain "(1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the pleader deems the pleader is entitled." This rule allows "notice pleading." *See Champagne v. Thurston County*, 163 Wn.2d 69, 84-85, 178 P.3d 936 (2008). However, the complaint still must adequately inform the defendant of the nature of the plaintiff's claims as well as the legal grounds upon which those claims rest. *Kirby v. City of Tacoma*, 124 Wn. App. 454, 469-70, 98 P.3d 827 (2004).

Here, Dalen's complaint alleged a series of facts about the events surrounding her admission to SJMC, beginning with her arrival at the ED and concluding with her filing a grievance with the hospital. Under her third and fourth causes of action for negligent and intentional infliction of emotional distress, Dalen incorporated the facts she previously alleged by reference, but made no mention under those headings of the newspaper article, Dr. Kranz's alleged online comments, other disparaging remarks directed against her post-hospitalization, or the respondents' medical bills.

Dalen did mention the comments responding to the newspaper article under her eighth cause of action, "HIPAA Law Violation." CP at 10. She alleged, "Following the publication of the article, several private facts about the Plaintiff and Plaintiff's condition were disclosed in the public forum attached to the on-line [*sic*] publication of the article. . . . The private information disclosed could only have been known by the Defendants or their agents." CP at 10. Dalen claims that these allegations in her complaint were sufficient to assert claims for emotional distress relating the respondents' conduct after her hospitalization. However, the trial court dismissed Dalen's HIPAA cause of action and Dalen does not challenge that ruling on appeal.

27

Further, notice pleading under CR 8 does not allow plaintiffs to allege only the factual basis in their pleading, leaving the plaintiff unrestricted as to any particular legal theory. *See Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 352, 144 P.3d 276 (2006). A complaint is insufficient if it fails to give the defendant fair notice of the claims asserted. *Id.*; *see also Trask v. Butler*, 123 Wn.2d 835, 846, 872 P.2d 1080 (1994). We conclude that the complaint language was insufficient to assert an emotional distress claim related to the respondents' conduct after Dalen's hospitalization.

Dalen also argues that she raised emotional distress claims not related to health care in her response to the respondents' summary judgment motion. Her response contained a heading titled "Emotional Distress Claims." CP at 53. But under that heading she argued that these claims related to the respondents' conduct in the hospital.

Dalen did raise the issue of Dr. Kranz's alleged comment on the newspaper article in her response, but did so under a "Facts" heading, where she argues "my HIPPA [*sic*] rights were violated on December 22, 2012 when Marc Kranz spoke of my supposed delusions and hallucinations noting his 20 years of experience treating head injuries . . . on the Daily News public forum comments section." CP at 52.

As in Dalen's complaint, her response to the summary judgment motion contained no link between her emotional distress claims and the alleged conduct of the respondents after Dalen's hospitalization. Instead, both her complaint and response to the motion linked her emotional distress claims to events that occurred during her admission and hospitalization.

Accordingly, we hold that the trial court properly dismissed Dalen's emotional distress claims.

C.      INSUFFICIENT SERVICE OF PROCESS

Dalen argues that the trial court erred in dismissing her claims against Dr. Kranz and Cascade because she presented a material issue of fact on whether they had been properly served. We disagree with respect to service on Dr. Kranz, but agree with respect to Cascade.

Proper service of the summons and complaint is required to invoke personal jurisdiction. *Scanlan v. Townsend*, 181 Wn.2d 838, 847, 336 P.3d 1155 (2014). When a defendant challenges service of process, the plaintiff has the initial burden of proof to establish the prima facie elements of proper service. *Id.* The defendant then must show by clear and convincing evidence that service was improper. *Id.*

In opposition to summary judgment, Dalen submitted an affidavit by her process server, who stated that the PeaceHealth risk management employee who accepted service stated that she was authorized to do so on behalf of all respondents. The respondents presented conflicting evidence: Huhta's declaration stating that PeaceHealth was not authorized to accept service for Dr. Kranz or Cascade.

1.    Dr. Kranz

RCW 4.28.080(16) governs personal service on an individual defendant and authorizes service by delivering a copy of the summons to the defendant personally or "by leaving a copy of the summons at the house of his or her usual abode with some person of suitable age and discretion then resident therein." Here, service was improper with respect to Dr. Kranz in his individual capacity. Service was made on a PeaceHealth risk management employee, not on Dr. Kranz personally. And the summons was not left with a resident of Dr. Kranz's abode. And there is no statutory provision that would allow a third person to accept service on behalf of an individual defendant apart from the requirements of RCW 4.28.080(16).

29

Therefore, regardless of what the risk management employee said, as a matter of law service on her was insufficient to serve Dr. Kranz.

2.    Cascade

Service on corporations is governed by RCW 4.28.080(9), which provides that service is proper if a copy of the summons is delivered

> to the president or other head of the company or corporation, the registered agent, secretary, cashier or managing agent thereof or to the secretary, stenographer or office assistant of the president or other head of the company or corporation, registered agent, secretary, cashier or managing agent.

The Supreme Court has held that service upon a medical clinic's administrative manager was sufficient where the defendant surgical center's registered agent worked at the clinic and the administrative manager served as registered agent's office assistant. *Weber v. Associated Surgeons, P.S.*, 166 Wn.2d 161, 164, 206 P.3d 671 (2009). Service was proper in that case even though neither the registered agent nor his office assistant worked for the defendant surgical center. *Id.*

Whether an individual is a "managing agent" of the corporation for purposes of accepting service under RCW 4.28.080(9) is a " 'question [that] turns on the character of the agent, and, in the absence of express authority given by the corporation, on a review of the surrounding facts and the inferences which may properly be drawn therefrom.' " *Reiner v. Pittsburg Des Moines Corp.*, 101 Wn.2d 475, 477, 680 P.2d 55 (1984) (italics omitted) (quoting *Crose v. Wolkswagenwerk Aktiengesellschaft*, 88 Wn.2d 50, 58, 558 P.2d 764 (1977)). A managing agent of the corporation "is truly and thoroughly a representative of it, rather than a mere servant or employee . . . and must be one having in fact representative capacity and derivative authority." *Id.* (italics omitted). Express authority to receive or accept service of process is not necessary. *Id.*

Here, the assistant who accepted service on behalf of Cascade affirmed to Dalen's process server that she was an acting agent who was authorized to accept service on Cascade's behalf. Unlike for an individual defendant, a plaintiff may be able to serve a corporate defendant by delivering the summons to a third person. It is possible that the assistant was Cascade's registered agent or that Peacehealth was Cascade's managing agent. Therefore, the assistant's statement was sufficient to create a genuine issue of fact regarding whether the assistant was authorized to accept service on behalf of Cascade. Although Huhta's declaration is inconsistent with the assistant's statement, we must view the evidence in the light most favorable to Dalen.

However, because " 'proper service of process is required for jurisdiction, sufficiency of service of process is a question of law. As a result, the determination of valid service is reserved to the judge.' " *Harvey v. Obermeit*, 163 Wn. App. 311, 327, 261 P.3d 671 (2011) (quoting *Gross v. Sunding*, 139 Wn. App. 54, 67, 161 P.3d 380 (2007)). Therefore, the trial court must make the factual determination regarding authority to accept service following an evidentiary hearing and then determine as a matter of law whether that service was sufficient under RCW 4.28.080(9) or some other statutory provision.

Accordingly, we hold that the trial court erred in dismissing all Dalen's claims against Cascade based on insufficient service of process.

CONCLUSION

We reverse the trial court's summary judgment dismissal of Dalen's claims for violation of RCW 71.05.050(3) regarding her involuntary detention in the ED, lack of consent claims, and

31

claims against Cascade, but we affirm the trial court's dismissal of Dalen's remaining claims and all claims against Dr. Kranz.

MAXA, C.J.

We concur:

JOHANSON, J.

LEE, J.